UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JEROME THOMAS                         CIVIL ACTION NO. 08-cv-1912

VERSUS                                JUDGE STAGG

WARDEN, LOUISIANA STATE               MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted Jerome "Doo Doo" Thomas ("Petitioner") of two counts of second degree murder, and mandatory life sentences were imposed.  The convictions were affirmed on direct appeal.  State v. Thomas, 938 So.2d 1178 (La. App. 2d Cir. 2006), writ denied, 957 So.2d 149 (La. 2007).  Petitioner later raised other claims in a state post-conviction application.  It was denied.  He now seeks federal habeas corpus relief.  For the reasons that follow, it is recommended the petition be denied.

**Sufficiency of the Evidence**

**A. The Evidence**

Demir Elikara and Cengiz Elikara were murdered on February 27, 2001 during an armed robbery of the Rite Way Liquor Store located on Martin Luther King Drive in Shreveport. The crime was initially discovered by Judy Gibbs, who saw a black male leaving the scene as she drove into the parking lot of the store. When she entered the store, she saw 32-year-old Demir lying face-down in a pool of blood but still alive. His 68-year-old father,

Cengiz, lay nearby, dead from a gunshot wound to the head. Ms. Gibbs ran from the store and contacted police. An ambulance took Demir to the hospital, where he soon died.

The robbers stole approximately $3,000 from cash registers in the store, several cartons of Newport cigarettes, a large plastic jar containing coins, and a videotape of the film "My Cousin Vinny." The tape was removed from what appeared to be a video surveillance VCR system, but it was actually just a VCR used by the employees to watch movies. Cameras mounted in the store were not connected to a recording device.

There were bloody footprints on the floor of the crime scene. Two cups of ice sat on the counter, and a pint bottle of Absolut Vodka lay on the floor beside Demir. A small amount of cash and change was scattered on the floor. Police found fragments of bullets and four spent .40 caliber cartridges.

The ice and the pint bottle of Absolut Vodka provided an initial clue to police. Mohammed "Mike" Rahman, Demir's business partner, testified that the "only customer" who ever bought pint bottles of Absolut was Holley Mims, the father of Demarein Mims. Mr. Rahman testified that Mims bought one pint a day, and two on the weekends. Demarein Mims was also a regular customer of the store. Demarein, along with Petitioner, was later charged with the murders. Demarein was convicted in a separate trial, and this court recently denied his habeas petition. Mims v. Warden, 2011 WL 4591883 (W.D. La. 2011).

Two days after the robbery and murders, Petitioner went to the police and said he wanted to give a statement.  Petitioner told detectives that he and Mims went to the liquor

store to get drinks.  Petitioner said he had not discussed committing a robbery with Mims, was not armed, and was shocked when Mims pulled a Glock .40 caliber pistol and shot the two clerks several times.  Petitioner then said Mims jumped over the counter to get money and ordered Petitioner to get the video tape, which Petitioner did because he was scared.  The two men then ran from the store.  A recording of the statement was played at trial, and a transcript can be found at Tr. 336-67.  Detective Shawn Hinderberger testified that Petitioner gave him a second, unrecorded statement soon afterward.  Hinderberger described the statement, and it was generally consistent with the recorded statement.  See Tr. 1539-41.

Robert "Popeye" Webb testified at trial that he was with Petitioner and Mims around noon on the day of the murders, on Legardy Street, and he heard them talking about "hitting a lick," or "doing a lick," which refers to committing a robbery. Webb testified that, later that evening, he was in a car with Monolo "Nolo" Baker and Lonnie Bryant. Webb said that Baker "rented" Mims and Petitioner his .40 caliber Glock pistol. Petitioner and Mims already had a .380 caliber pistol. Later that evening, Webb saw Petitioner and Mims walking toward Rite Way Liquor Store. About 20 minutes later, Webb and Baker were driving near the liquor store when they saw Judy Gibbs, the customer who discovered the crime, running across the street. She was "hollering and crying" that someone in the liquor store was dead. Baker pulled up and asked her whether she had seen somebody run out of the store, and she said that she had seen a man running across the street.

Webb and Baker drove to Jackie Robinson Drive, where they saw Petitioner and Mims emerge from a trail in the woods. The men were muddy and out of breath. Baker picked them up and took back his Glock. The magazine was missing. Petitioner and Mims paid Baker some money for using the gun and losing the magazine. Webb testified that Mims was upset with Petitioner because Petitioner had "frozen up" on him. According to Webb, Mims said he "had to do it all by himself." Later, at Baker's house, Webb saw Petitioner counting his money from the robbery, which Webb thought was about $800–$900.

The .380 pistol was never recovered, but police did find .380 ammunition inside a slit in Petitioner's mattress. Two days before the robbery/murders, a stolen Caddo Parish Sheriff's car was found, stuck in the mud, in the neighborhood where the crimes where committed. Missing from the trunk was a Glock .40 caliber pistol. The Glock, which was the focus of an intense police search, was found after the murders inside a Crown Royal bag in the yard of a deputy who lived in the same neighborhood. The crime lab matched the pistol to the casings and bullet fragments recovered during the investigation.

Petitioner's girlfriend, Katrina Bailey, testified that Petitioner and Mims were at her house around 5:00 p.m. on February 27. The two men left on foot. Katrina saw Petitioner again later in the evening when she rode with her cousin, Stephanie Shorter, who was Mims' girlfriend, to pick up Petitioner from Nolo Baker's house. When Petitioner came out of the house, he was carrying Newport cigarettes and a Crown Royal bag that he held by the

drawstring and the bottom of the bag. Katrina said Petitioner was acting "kind of uppity like," in a happy mood.

Katrina testified that she and Petitioner went to her house to spend the night. She hid one of Petitioner's Nike shoes in a hole in her closet because it looked like it had blood on it. Katrina said that some blue and black Nikes Petitioner usually kept in her carport were gone the next morning. Later that day, Petitioner called Katrina on her cell phone while she was at school. He told her that he and Mims were "involved with the robbery at the Rite Way Liquor Store." Petitioner told Katrina said that they knew the "old man" was working that night, which would make it easier to get some money, that Petitioner was the "watchman" and was supposed to "make sure no one came in," Mims shot each victim three times, and Petitioner received money from the robbery.

Stephanie Shorter's testimony corroborated much of Katrina's. Stephanie added that when the two women arrived at Baker's home, she saw Baker's gun on the coffee table. Stephanie also stated that Mims contacted her around 3:00 a.m. the next morning, and she picked him up from his cousin's apartment. Mims was upset and drunk. Stephanie admitted to moving one of Petitioner's "gangster" Nikes from Katrina's home to Mims' cousin's apartment and later showing the police where it could be found. During the investigation, it was determined that Petitioner's Nikes made footprints "consistent" with the bloody footprints at the murder scene, but a positive "match" could not be made, nor could any blood evidence be recovered from the shoes, which appeared to have been washed.

Elmer Henderson grew up with Petitioner and worked with him at Popeye's Fried Chicken. He testified that in early March 2001 (a few days after the murders) he gave Petitioner a ride after work to Petitioner's sister's house. Petitioner started crying during the drive but refused to tell Henderson what was wrong. After they arrived at Petitioner's sister's home, Petitioner locked himself in the bathroom. Henderson grew concerned and pushed in the door. He found Petitioner sitting on the toilet crying in a daze. Petitioner told Henderson he was upset because he went to the store with another man to get drinks, the other man pulled a gun, and "it went from there." Petitioner said he also had a gun, but when the other man pulled his gun Petitioner "just froze up against the pop box."

The jury was charged that to convict Petitioner of second degree murder under La.R.S. 14:30.1 the State had to prove beyond a reasonable doubt that either Mims or Petitioner killed the victims with either specific intent to kill or to inflict great bodily harm, or while they were engaged in an armed robbery even though there was no intent to kill or inflict great bodily harm.  The State had to prove that Petitioner was "concerned in" the commission of the armed robbery so as to be a principal to that crime.  The principal to an armed robbery in which the victim is killed by another principal may be convicted of second degree murder. The jury convicted Petitioner of both counts of second degree murder.

### B. Sufficiency of the Evidence

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,

*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979).  The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011). A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable. Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

### C. Analysis

Petitioner challenged the sufficiency of the evidence on direct appeal, where the state court reviewed the facts discussed above, the elements of the crime, and the applicable Jackson standard.  The state appellate court wrote that Petitioner had "confessed to being present during the robbery, which he claimed was committed by Demarein Mims," and that Petitioner "did not expect anyone to be killed during the robbery," in which Mims was the trigger man.  State v. Thomas, 938 So.2d at 1181.  That summary perhaps suggests that Petitioner confessed to knowing a robbery would be committed, which the transcript does not bear out.  The court then wrote, in its Jackson analysis, that Petitioner's role as a principal in the armed robbery is supported by the evidence, "in particular, his own statements to police."  The court wrote that the "statements established defendant's participation with Mims in planning the armed robbery, including their use of the Glock pistol."  Thomas, 938 So.2d at 1183.  The record does not, however, support the court's statements on this point.  Petitioner took the position in his statement, which the court called a confession, that he had no idea Mims was going to commit a crime in the store.  He did say he knew Mims owned a Glock .40 caliber, but he said he had never seen or shot it before.  He did not say whether he knew Mims had the weapon with him when they entered the store.  Petitioner was asked if he had "any idea what was going to happen that night?"  He said, "no, sir.  I thought we had been going to get drunk (inaudible)."  Tr. 347.  This exchange happened later:

> Detective Crow:    You're saying you didn't have any idea that he was going
>                    to do this when y'all went over there?

| | | |
|---|---|---|
| Petitioner: | No, sir. | |
| Detective Crow: | He hadn't mentioned it?   Y'all hadn't talked about it earlier? | |
| Petitioner: | No. | |
| Detective Crow: | With nobody? | |
| Petitioner: | Nobody. | |

Tr. 352.

The appellate court went on to say that the convictions were supported by Petitioner's later statements to Katrina Bailey and Elmer Henderson that Petitioner was involved in the robbery, as well as the testimony of Robert Webb and Stephanie Shorter.  Webb's testimony indicated that Petitioner was a knowing participant in the robbery and, although he may have frozen up during the crime, he went into it knowingly and received cash proceeds from the robbery. Bailey testified that Petitioner confessed to her that he was involved with the robbery and acted as the watchman and received money from the robbery.  Henderson testified that Petitioner told him he went with another man to get drinks, the other man pulled a gun, and it "went from there," but Henderson did not say that Petitioner confessed to knowingly participating in the robbery.

A federal habeas court does not review the quality of the state court's decision or whether its reasoning was correct.  The only question is whether the ultimate decision by the state court that the evidence was sufficient to support the convictions was not only incorrect but was an objectively unreasonable application of the Jackson principles. Neal v. Puckett,

286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."); Santellan v. Cockrell, 271 F.3d 190, 193-94 (5th Cir. 2001) ("The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning"). Applying this standard, Petitioner is not entitled to habeas relief. There was testimony, particularly from Robert Webb and Katrina Bailey, on which a rational juror could have found Petitioner guilty of two counts of second degree murder. Accordingly, habeas relief is not permitted on this claim.

**Excessive Sentence**

Petitioner argued on direct appeal that his mandatory life sentences were unconstitutionally excessive under the Louisiana Constitution.  The state appellate court found that the sentences were valid because they were not grossly disproportionate to the severity of the offense or shocking to the sense of justice.  State v. Thomas, 938 So.2d at 1185. Petitioner continues the argument in this court, but the heart of his argument is that it is unconstitutional to sentence him for life when he was not proved guilty.  The sufficiency of the evidence claim was resolved above.

To obtain habeas relief, Petitioner would have to show that state court's rejection of this claim was contrary to, or involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1). The Supreme Court has denied habeas relief in a case that claimed a

disproportionate sentence for a prisoner who was convicted of two counts of petty theft and received two consecutive terms of 25 years to life under the state's three-strikes law.  The Court noted that its precedents in the area have not been a model of clarity, so the only clearly-established law amenable to the Section 2254(d) framework is a gross disproportionality principle, the contours of which are unclear, applicable only in the "exceedingly rare" or "extreme" case.  The Court held that the state court's rejection of the excessive sentence argument was not an unreasonable application of its clearly established law.  Lockyer v. Andrade, 123 S.Ct. 1166 (2003).

Mandatory life sentences are routinely imposed in Louisiana for second degree murder, including felony-murder committed by a principal who was not the trigger man.  The Supreme Court has never held or even suggested that a life sentence for that crime violates the Constitution. Accordingly, Petitioner cannot meet his habeas burden on this issue.  See Jones v. Cain, 2010 WL 3924010, *10-11 (E.D. La. 2010) (rejecting habeas claim that life sentence for second degree murder was unconstitutional).

**Denial of Motion for Mistrial**

Petitioner was charged with second degree murder, but the jury was also instructed on the lesser responsive verdict of manslaughter.  Near the end of the defense closing argument, counsel stated: "You have heard and you know and you will be told by the Court what the options are in your deliberations.  You heard and you know what the (sentencing) range is with those."  Tr. 1779.  The prosecutor responded during rebuttal to defense

counsel's "final plea for you to consider the ranges in this case."  The prosecutor urged the jury to not base its verdict on passion, sympathy or other such matter, but to listen to and follow the jury instructions.  He said that, just as the State should not show bloody pictures and stir up prejudice in an attempt to get a guilty vote, the defense should not attempt to persuade the jury to "feel sorry" for the defendant and "cut him a break even though he doesn't deserve one, even though the evidence doesn't show it."  He said that to do so would subrogate the duty of the jurors to base their decision on the law and the evidence, would deprecate the seriousness of the offense, and would deprecate the man hours invested.  Tr. 1786. Additional remarks on the "man hours" issue are at the center of this issue.

> The prosecutor followed his reference to man hours with this argument:

> Keep in mind as to Detective Hinderberger's testimony that you have multiagencies working on this case.  You have officers putting in man hours to the point where they're working day by day without sleep.  When you have an investigation that lasts weeks and weeks after the homicide, and this is the peak of it.  This is the last man in the house of cards that we have brought down in this case.  And I ask you, ladies and gentlemen, this is not an appropriate manslaughter case.

Tr. 1786-87.

> Defense counsel did not object at that point, but he did when the prosecutor returned to the issue and said: "I asked on behalf of our victims, on the police investigating this case, and I stand - - ."  Counsel objected at this point, a bench conference was held, and the prosecutor continued his argument without returning to that issue.  Tr. 1789.

After arguments were completed, defense counsel placed on the record his objection to the prosecutor's rebuttal closing argument. He objected to the two occasions when he said the prosecutor appealed to the jury's passion and suggested they owed some form of duty to the investigating officers to convict a person and send them to prison for life because the police worked hard on the case. The prosecutor said the argument was a response to the defense argument, which the prosecutor interpreted as asking for a lesser verdict of manslaughter based on sympathy because of the mandatory life sentence for second degree murder. The trial judge ruled that the remarks were not improper, noting that the prosecutor never finished the second statement that drew the objection.

Defense counsel argued during the discussions that the argument warranted a mistrial. The trial judge denied the motion. Tr. 1797-99. Petitioner pursued the issue on direct appeal. The appellate court summarized the relevant facts and found "there was nothing inappropriate about the ADA's comments" because they simply stated that the police worked hard and the victims deserved justice. State v. Thomas, 938 So.2d at 1183.

To obtain habeas relief on this issue, Petitioner must show that the state court's adjudication was contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Improper jury argument by the state does not provide a basis for habeas relief unless the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986). The petitioner must also demonstrate

prejudice by showing that the misconduct was so persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks.  Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988); Turner v. Johnson, 106 F.3d 1178, 1188 n. 46 (5th Cir. 1997).

Petitioner did not meet his burden to obtain relief on this issue.  The challenged comments, assuming any impropriety about them, were brief, contained within a lengthy closing argument that focused primarily on the evidence and the duty to obey the jury instructions, and could fairly be said to respond to a defense argument.  There is absolutely no basis to conclude that they infected the trial with unfairness or that there is any reason to believe the conviction would not have occurred but for the challenged remarks.  Furthermore, the Darden principle is a general one, which leaves the lower court with a great deal of latitude to determine that a petitioner has not satisfied it.  Knowles, 129 S.Ct. at 1420.

**Jury Composition**

Petitioner challenges the trial court's refusal to disqualify two jurors.  The first is Deveda Moore, who during the trial brought it to the attention of the court that she knew Richard Beighley, a criminalist who was the State's witness on firearm issues and footwear impressions.  Ms. Moore said that she acknowledged during jury selection, when the list of witnesses was read, that she knew Mr. Beighley, but no attorney asked her any questions on that issue. In response to the court's questions, Ms. Moore said that her knowing Mr. Beighley would not have any influence on her judging his testimony and expert opinion, and

she would fairly and impartially evaluate his testimony just like the testimony of any other witness.  The judge said that he was convinced Ms. Moore could be fair and impartial, and he declined to allow defense counsel to further examine the seated juror.  Tr. 1594-97.

Juror Jo Ann Taylor approached a deputy during the trial and told him that she realized during the trial that she worked with Petitioner's father at the LSU Medical Center hospital.  Ms. Taylor told the court, "We're not friends are anything, we just work at the same place."  When asked how often she saw Petitioner's father, Ms. Taylor replied: "Well, it's not on a daily basis. I might run into him every once and awhile."  She described the relationship as one where she might say good morning or hello, and she told the court it would not have any effect on her ability to be fair and impartial in the case.  The trial judge found that Ms. Taylor could be fair and impartial, and he again did not allow further questioning given the sensitivity of examining a sitting juror.  Tr. 1597-99.

The state appellate court reviewed these facts and applied Louisiana jurisprudence regarding disqualification of jurors.  Some of those cases hold that disclosure during trial that a juror knows or is related to a witness or the victim is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict.  The appellate court found that the trial judge made a sufficient inquiry and acted in his discretion with regard to this issue.  State v. Thomas, 938 So.2d at 1184-85.

Petitioner argues that it was error to allow impartial (sic) jurors to remain on the jury. His argument is essentially a challenge for cause.  The standard for determining when a

venire member may be excluded for cause is whether the prospective "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 105 S.Ct. 844, 852 (1985) (internal quotation marks and footnote omitted). A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness on habeas review. Miniel v. Cockrell, 339 F.3d 331, 338-39 (5th Cir. 2003), citing  Jones v. Butler, 864 F.2d 348, 362 (5th Cir.1988).

The state trial and appellate courts thoroughly reviewed this issue and found as fact no indication that either juror would not act fairly and impartially.  Those findings are fully supported by the record, and there is no basis to determine that the state court's adjudication of this issue was an objectively unreasonable application of the Wainwright principle, which would be necessary to obtain habeas relief.

**Motion to Suppress**

Petitioner filed a motion to suppress his statements to the police.  An evidentiary hearing was held, and the state courts found the statements admissible because they were made freely and voluntarily after waiver of Miranda rights.  Petitioner argues in his federal memorandum that he "was not made aware of the fact that his status changed from voluntary interview to custodial interrogation."  Petitioner argues: "This is deceptive and coercive in nature" and the "deception was a form of coercion that rendered the confession involuntary in violation of" the Fourteenth Amendment, Miranda, and similar authorities.  He also

contests admission of the statements when "the State could not provide a signed and initialed rights and waiver of rights form to substantiate the officer's testimony in behalf of the State that the confession was voluntary."

Detective Foster testified at the suppression hearing that, two days after the murders, Petitioner came to the Shreveport Police Department. He was not summoned by police. He simply appeared at the police department accompanied by his mother, sister, and an uncle who worked security for the school board.  The uncle told Foster that Petitioner wanted to talk to detectives about the homicides at the liquor store.  Petitioner's mother said that Petitioner knew something about the case, might be involved or something, and she "thought he might need an attorney."

Foster went to talk to Petitioner, who was in Sgt. Crow's office.  Petitioner said he wanted to talk to the police about the case, "but he didn't know whether or not he might need a lawyer."  Foster told Petitioner that he would try to get a lawyer, and he called an assistant district attorney (ADA) to see if an attorney could be appointed.  The ADA said he would call a judge and see what he could set up.  Foster told Petitioner about the call, said he was waiting for a return call from the ADA, and went back to his office to wait.

A short time later, probably not more than 20 minutes, Sgt. Crow came to Foster's office and told him that Petitioner was waiting in Crow's office when Petitioner's mother and uncle entered and said they wanted to talk to Petitioner.  Crow left to let them talk.  Soon afterwards, they  came out and said Petitioner wanted to go ahead and give a statement and

not wait for a lawyer.  Foster and Crow went back to Crow's office, where Petitioner was waiting.  Petitioner was asked if he wished to have his mother present during the statement, and he said he would rather she not be in the room.  The recorded statement was then given. Tr. 1297-1303.

The recorded statement begins with Petitioner agreeing with Detective Foster that they had not talked at all other than to set up to talk.  Foster then read Petitioner his <u>Miranda</u> rights from a card, and Petitioner followed along on the written form.  Petitioner said that he understood his rights, waived them and wished to make a statement, and signed the rights card.  Tr. 336-38.  Petitioner also said during the statement that he was in his freshman year of college at Southern University in Shreveport and could read and write.  Tr. 341.  Petitioner stated near the beginning and at the end of the interview that he came in on his own to talk to the police and gave no statement until the tape recorder was on.  He denied any threats or promises were made.  Tr. 336, 366.

Foster testified at the hearing, consistent with the transcript of the statement, that Petitioner's <u>Miranda</u> rights were read, acknowledged, and waived before Petitioner made his statement.  He and the prosecutor admitted, however, that the "rights card" that Petitioner initialed could not be located.  Tr. 1305, 1312-13.  Foster also testified that Petitioner was never under arrest, there was no probable cause to arrest him, and he was free to leave at any time during this visit to the police station.

When Petitioner arrived at the station and said he wanted to make a statement about the Rite Way Liquor murders, police called Detective Hinderberger, who was assigned to the case but was home and off duty at the time.  He and Detective Andrews arrived at the station while Foster and Crow were still interviewing Petitioner, and they waited for the interview to be completed.  Hinderberger stepped into the room while Foster and Crow were still present, and asked Petitioner if he had been advised of his rights and whether he still wanted to make a statement.  Petitioner said yes to both questions.  Hinderberger then stepped out to discuss with Crow and Foster what Petitioner had told them, and Detective Andrews went into the office.  Tr. 1335-40.  Tr. 1328-30. Hinderberger said he did not repeat the Miranda warnings, but Sgt. Andrews testified that he did.  Tr. 1328.  Andrews testified that Petitioner indicated that he understood his Miranda rights, waived them, and was willing to answer questions without an attorney present.  Tr. 1328-29.  Petitioner initialed and signed a rights waiver form, which was introduced into evidence.  The interview with Andrews and Hinderberger was not recorded.  At the conclusion of the statement, Detective Hinderberger arrested Petitioner for first degree murder.  Tr. 1331.

Petitioner testified that he asked for an attorney when one of the two detectives was present.  He was asked whether he said he may need an attorney or wanted an attorney.  Petitioner testified: "I said, I want an attorney."  He said the detective said he would see what he could do.  Petitioner denied that the detectives ever left and let him, his mother, and uncle

talk in the room.  Petitioner said he changed his mind and agreed to talk without an attorney because a detective was telling him that he needed to clear his name.  Tr. 1341-44.

The trial judge made a lengthy bench ruling.  He found that Petitioner voluntarily came to the police station and could have left even after the statement began, "[s]o this didn't start out as a custodial interrogation."  He also found as fact that Miranda rights were administered and waived, and Petitioner never invoked his right to counsel.  The statement was deemed voluntarily and intelligently made, as was the second statement, in which the court found the Miranda rights were again read to Petitioner and waived.  Tr. 1346-50.

Petitioner raised on direct appeal arguments similar to those presented in his federal petition.  Tr. 1836-38.  The appellate court found that the record supported the trial court's finding that Petitioner clearly and unequivocally initiated, through his family, his desire to talk with officers, and he validly reversed his earlier hesitancy to speak without counsel.  The decision was made in the presence of close and trusted family members, the record affirmatively showed that Petitioner was advised of and waived his Miranda rights before giving his statements, and the statements were made freely and voluntarily.  State v. Thomas, 938 So.2d at 1183-84.

Habeas relief is not permitted unless the state court's adjudication of this issue was an objectively unreasonable application of clearly established Supreme Court precedent.  Petitioner's first argument is that his status changed from a voluntary interview to custodial interrogation once he provided information that placed him at the scene of the crimes.  Even

Page 20 of  24

if this were a custodial interrogation from the beginning, however, all that requires is a warning of the <u>Miranda</u> rights and obtaining a valid waiver.  Those things were done.  Petitioner contends that this was somehow coercive in nature, although he admits in the same sentence that he was "not made aware of the fact" of this alleged status change.  There is no basis to find that the police officers' unspoken thoughts about whether they might arrest Petitioner at the conclusion of his statement amounted to coercion.

Petitioner argues that the prosecution did not provide a signed and initialed waiver of rights form.  The State did, however, offer persuasive testimony that the rights were read and waived, and the testimony was supported by Petitioner's own words in the recorded statement.  There was, therefore, ample evidence to support the State court's decision that a waiver occurred.  Furthermore, it is not necessary to introduce a written waiver.  Even when a suspect refuses to sign a written waiver but nonetheless agrees to discuss an alleged crime, a waiver can be found.  <u>U.S. v. Oliver</u>, 630 F.3d 397, 409-10 (5th Cir. 2011).  "Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  <u>Berghuis v. Thompkins</u>, 130 S.Ct. 2250, 2262 (2010).  Even if one were not persuaded that the evidence discussed above established an express waiver, Petitioner's conduct also demonstrates an implied waiver of the right to remain silent and the right to counsel.

Detective Foster testified that Petitioner said he thought he might need an attorney and did not know whether he might need a lawyer.  Such ambiguous statements do not require the cessation of questioning because a suspect must unambiguously request counsel.  Davis v. U.S., 114 S.Ct. 2350, 2355 (1994).  Neither Petitioner nor the state courts have focused on it, but Foster also testified: "He said he didn't have a lawyer and he needed one."  Foster said that is when he called an ADA to see if a lawyer could be appointed.  Tr. 1300.  That reported statement arguably satisfies the Davis standard to invoke the right to counsel.  Once it is invoked, the suspect is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.  Edwards v. Arizona, 101 S.Ct. 1880 (1981).  The evidence shows that there was no questioning until Petitioner, after meeting with his family, communicated to the police that he wished to go ahead and give a statement without waiting for a lawyer.  Tr. 1301-02.  Petitioner thus reinitiated the conversation. And, again, all of this assumes that the Miranda warnings were required, but the facts showed that they were not because Petitioner was not subjected to custodial interrogation. No relief is available on this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within **fourteen (14) days** from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 26th day of October, 2011.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE